adopting the Order and Recommendation of the Honorable Catherine D. Perry filed on August 31, 1994.

Federal law governs the issue of res judicata in this case because the earlier lawsuit, Cause No. 4:92CV1386 SNL, and this lawsuit, Cause No. 4:93CV2047 GFG, are cases in which federal questions are presented. *See Roach v. Teamsters Local Union No. 688*, 595 F.2d 446, 448 n. 3 (8th Cir.1979). In general, the doctrine of res judicata provides that "[a] final judgment on the merits of an action precludes the parties or their privies from re-litigating issues that were or could have been raised in that action." *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981). The res judicata bar applies if "(1) the prior judgment was rendered by a court of competent jurisdiction, (2) the decision was a final judgment on the merits, and (3) the same cause of action and the same parties or their privies were involved in both cases." *Headley v. Bacon*, 828 F.2d 1272, 1274 (8th Cir.1987).

Under the doctrine of res judicata, a judgment on the merits of a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). For res judicata purposes, a "claim" or "cause of action" is the same when it arises out of the same nucleus of operative fact or is based upon the same factual predicate. *Murphy v. Jones*, 877 F.2d 682, 684–85 (8th Cir.1989). The doctrine of res judicata precludes relitigation of a claim on grounds that were raised or could have been raised in the prior action. *Lane v. Peterson*, 899 F.2d 737, 741 (8th Cir.), *cert. denied*, 498 U.S. 823, 111 S.Ct. 74, 112 L.Ed.2d 48 (1990); *Poe v. John Deere Co.*, 695 F.2d 1103, 1105 (8th Cir.1982).

Privity exists between the plaintiffs in the two cases, because plaintiffs have such a close relationship, bordering on near identity, that they are for purposes of res judicata the same parties. *Midcontinent Broadcasting Co. v. Dresser Industries, Inc.*, 669 F.2d 564, 566 (8th Cir.1982). Similarly, a person is in privity with a party or a prior action if "the interests of the non-party are so closely related to the interests of the party, that the non-party can fairly be considered to have had his day in court." *Gribben v. Lucky Star Ranch Corp.*, 623 F.Supp. 952, 960 (W.D.Mo.1985). Since some of the plaintiffs in this case were not plaintiffs in the earlier case, res judicata can bar their claims only if they were in privity with the plaintiffs in that case. The plaintiffs in both cases are inmates presently or formerly incarcerated at the Farmington Correctional Center. Moreover, the Court notes that some of the plaintiffs in this case requested consolidation of the two cases. The Court finds that the interests of the plaintiffs in the two cases are the same and will therefore dismiss this case as barred by the doctrine of res judicata.

**UNITED STATES of America, Plaintiff,**

**v.**

**SARGENT COUNTY WATER RESOURCE DISTRICT, a political subdivision for the State of North Dakota; The State of North Dakota; Moore Engineering, Inc., and Radniecki Construction Company, Inc., Defendants.**

Civ. No. A3–88–175.

United States District Court,
D. North Dakota,
Southeastern Division.

April 6, 1992.

See also 876 F.Supp. 1090.

Lynn E. Crooks, U.S. Attorney's Office, Fargo, ND, Samuel W. Plauche, U.S. Dept. of Justice, Environmental Defense Section, Washington, DC, David Carson, U.S. Dept. of Justice, Environmental Defense Section, Denver, CO, for plaintiff.

Dean Allen Rindy, Ohnstad Twichell, P.C., West Fargo, ND, Duane R. Breitling, Ohnstad Twichell, P.C., Fargo, ND, for Sargent County Water Resource Dist.

Richard Henderson, Nilles, Hansen & Davies, Ltd., Fargo, ND, for Moore Engineering, Inc.

Radniecki Const. Co., Inc., pro se.

Richard Norval Jeffries, Jeffries, Olson, Flom, Oppegard & Hogan, Moorhead, MN, for Radniecki Const. Co.

Julie Ann Krenz, Atty. General's Office, Bismarck, ND, for State of N.D.

## MEMORANDUM AND ORDER

WEBB, Chief Judge.

On January 31, 1992, the court heard oral arguments on the United States' motion for summary judgment (docket entry # 101), Sargent County Water Resource District's [the County] motion to dismiss (docket entry # 103), and Moore Engineering, Inc.'s [Moore], motion for summary judgment (docket entry # 104). The State of North Dakota joins the County and Moore in their motions (docket entry # 115).[1] Also before the court is the United States' motion to bifurcate into separate trials the issues of liability and damages (docket entry # 97).

This is a dispute between the County and the federal government over three sloughs. The County performed work on a drainage ditch that bisects the sloughs. The government argues the work required a permit under the Clean Water Act [CWA].[2] The County argues that the government has no jurisdiction over the sloughs, and alternatively, that the work was expressly exempt under the CWA.

The County hired an engineer, Moore, and a contractor, Radniecki Construction Co. [Radniecki], to do the work. The government sued them as well.[3] Moore argues it did not have sufficient responsibility for or control over the work to be liable.

After due consideration, and as explained below, the court determines that 1) the sloughs are subject to the Clean Water Act, but that 2) there is a genuine factual issue whether the work is exempt under the CWA, and that 3) Moore did not exercise sufficient control over the work to be liable.

### Facts

Before the work at issue here was performed, Bruns, Big, and Meszarous Sloughs made up part of a productive and important wetland habitat for a variety of migratory waterfowl and other marshbirds. Ducks banded in Sargent County have been recovered in 34 states, 10 Canadian provinces or territories and 13 countries. Tens of thousands of migratory waterfowl have been observed at Big Slough alone. The giant Canada goose, long thought to be extinct but now making a recovery, has been observed nesting at Bruns and Big Sloughs. The bald eagle, an endangered species, has also been observed at the same two sloughs.

Bruns Slough is bisected by North Dakota Highway 13, providing easy access to the slough. Meszarous Slough is also easily accessed due to its proximity to North Dakota

---

1. The State of North Dakota is a defendant only because it may be liable under the Clean Water Act for a judgment entered against the County.

2. 33 U.S.C. §§ 1251–1387.

3. Radniecki has gone or is going through bankruptcy and is no longer represented by counsel in this matter.

Highway 11 and a well maintained county road. Parts of Big and Meszarous Sloughs are owned by the North Dakota Game and Fish Department and are open to the general public for bird watching throughout the year and for hunting in season.

On its southern border, Sargent County is contiguous to South Dakota. Sargent County is also relatively close to the Minnesota border. Due to their access and location, Bruns, Big and Meszarous Sloughs could provide recreational opportunities for residents of all three states.

In 1917 Sargent County began construction of Sargent County Drain 11. The ditch cuts through Bruns, Big, and Meszarous Sloughs, respectively, before draining into the Wild Rice River near Brampton, North Dakota. The purpose of the ditch was to provide an out-fall for surface runoff in a large portion of the western part of the County. The ditch has about thirty-five miles of main and lateral channels. There are about seven miles of ditch between Meszarous Slough and the outlet into the Wild Rice.

The depth of the ditch was first surveyed in 1919. The County maintains this survey was conducted before construction activity on the drain was complete, and that original construction continued until late 1923 or early 1924. The United States disputes that any of the original work was done after 1919. However, from Meszarous Slough through the last seven miles of ditch there was no survey, suggesting that work was not complete when the survey was done. The County also maintains that maintenance work has been done on the ditch periodically through the years and that the ditch has always performed, at least minimally, a drainage function. The United States disputes that any maintenance was done on the ditch after

it was originally constructed and argues the County abandoned the ditch as a drain.

In connection with the Garrison Water Diversion Project, another survey of the ditch was conducted in 1969 by the United States Bureau of Reclamation. All parties agree that the 1969 survey does not reflect the actual ditch bottom, but includes varying amounts of silt that had accumulated due to the gradual process of sedimentation.

Sometime prior to 1984 the County decided to clean the silt out of the ditch. The County tried to obtain funding for the work from the state. Assistance is available from the state for new construction, but not for maintenance. The state considered the work to be performed on Drain 11 strictly maintenance and would not assist the County in funding the project.[4]

The County retained Moore to prepare a drawing showing the pre-existing profile, or bottom elevation, of the ditch. Moore's drawings have information from the original design concerning the bottom width and side slopes of the ditch, and purport to show the bottom elevation of the pre-existing ditch. The County did not retain Moore for the purpose of obtaining a permit from the Army Corps of Engineers. Moore suggests they were not asked to do so because the County made a policy decision not to seek a permit.

The County then contracted with Radniecki to perform the work. Moore did not prepare any specifications for the contractor, it was not involved in the bidding, it did not administer the contract, it did not conduct any inspections of the contractor's work during or after construction, and it did not approve payments to the contractor.

Moore's drawings did not contain any instructions about the placement or disposal of the silt removed from the ditch during clean out. Moore was not asked to make any determination or give any instructions about

4. This information was provided to the court through exhibits attached to the Affidavit of Cary Backstrand, filed with the County's supplemental brief (docket entry # 133) requested by the court at oral argument. The United States moves to strike the affidavit as untimely, and because the affidavit offers expert opinions not disclosed to the government. However, in its brief in support of the motion to strike, the government acknowl-

edges that the sole fact the affidavit offers is that the State of North Dakota did not fund the County's activities at the drain. That is the only context in which the court has considered the exhibits attached to the affidavit; not in the context of an expert opinion on the issue of maintenance. The government's motion (docket entry # 137) is DENIED.

the placement of the material, nor did it give any such instructions.

Moore set depth stakes to show Radniecki how deep to dig the drain. However, the depth stakes were not that critical to the performance of the work. For the most part Radniecki could establish on his own the depth of the ditch. Moore also set centerline stakes so that Radniecki could find the center of the drain. There was a need at times to rely on Moore's centerline stakes or to ask Moore to stake the centerline of the ditch. However, in many areas the drain was not staked and Radniecki performed work without any direction from Moore.

The work at issue here started in 1984 and continued until 1987. The contractor, Greg Radniecki, indicated that on average there was about two feet of silt in the ditch. Radniecki testified that experienced contractors could discern an old ditch bottom by comparing soil colorations, and that for the most part he could tell the pre-existing depth of the ditch. He also testified that he was told by the County only to return the ditch to its pre-existing depth and that that's all that was done.[5]

Radniecki performed work on the ditch within the sloughs themselves. Excavated material was sidecast into the sloughs themselves, but for the most part on top of old spoil piles from earlier work. However, in some areas the spoil piles were submerged and had become "wetlands", and in some areas Radniecki could not locate the old spoil piles. Both Big and Bruns Sloughs were partially drained before Radniecki performed work within the sloughs, and the excavated material was sidecast in the slough proper and levelled with a bulldozer.

There was a third survey in 1990, after the work at issue here was complete. Charts have been filed with the court comparing the 1919, '69 and '90 surveys, as well as Moore's proposed design. Because the 1919 survey does not cover the entire length of the ditch, these charts include the 1919 recommended design from Meszarous Slough through the last seven miles of ditch.

In 1990 the last seven miles of Drain 11 were about a foot deeper than reflected by the 1919 recommended design. However, the 1919 recommended design is of little significance. The 1969 survey (even with the silt fill-in) shows deeper depths than the 1919 design. Obviously in 1969 the actual ditch bottom was deeper than the 1919 design, either because the original work did not follow the design or because work was performed on the ditch in the meantime.

The 1990 survey also shows that Drain 11 was deeper than the 1919 depth for about 2 miles between Big and Meszarous Sloughs, as well as a few locations between Bruns and Big Sloughs. However, in at least two locations the 1969 survey (with the silt fill-in) reflects a deeper depth than the 1919 survey.[6] This also suggests work was performed on the ditch in the meantime, and that neither the 1919 survey nor design reflect the actual ditch bottom as it existed in 1984–87, when the work at issue here was performed.

The survey charts also show that Moore's design was not followed by the contractor. There are substantial variances between the work that was actually performed and the plans provided by Moore.

Finally, the evidence filed with the court concerning the present condition of the sloughs is very limited. At oral argument, all parties left the court with the impression that the sloughs are entirely drained. The court has no reason to doubt those assertions, but has searched the record and found little upon which to base that conclusion.[7]

---

5. Radniecki did testify that in very limited spots, at the most fifty feet, some virgin soil was removed. However, his purpose in doing so was not to improve the ditch or deepen its original grade, but to restore the original grade in places where the ditch was underexcavated.

6. The two locations are at Stevenson Stationing points 140 and 760 on the charts. There are also several locations where the 1969 survey reflects the same depth as the 1919 survey.

7. The only evidence of present use of the wetlands is a short paragraph in the declaration of Martin Keller, Exhibit 9 attached to docket entry # 122. The scant information provided there purports to be based in part on a personal view of the sloughs but does not indicate when that view took place. The paragraph says little other

■ Assuming the sloughs are presently dry, the court is disturbed that none of the parties have presented any evidence on a fact the court is personally aware of and takes judicial notice of—the recent drought.[8] The effect the County's work had or may have had on the three sloughs is the central issue in this case. Yet no evidence has been presented to the court to show that but for the County's work on the ditch, the sloughs would not be dry. No evidence has been presented comparing the condition of these three sloughs with similar sloughs in the area. No evidence has been presented to show whether under normal conditions, the drain could operate efficiently **and** the sloughs could remain viable.[9] It would be unjust to hold the County responsible not only for their acts, but for those of Mother Nature as well.

### Analysis

#### Jurisdiction

For jurisdiction to exist, the government must show that the County discharged a pollutant into waters of the United States by sidecasting excavated material into the three sloughs. *See, e.g., Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 922–24 (5th Cir.1983) (redeposition of dredged material back into a wetland governed by the CWA). The County disputes that jurisdiction exists for two reasons.

First, the County argues that the discharges only occurred on top of old spoils and not within the sloughs themselves. The record shows otherwise. In some areas the old spoil piles were submerged and part of the wetland, and in other areas the old spoil piles could not even be located. Additionally, in Bruns and Big Sloughs, the old spoil piles and the newly excavated material were bulldozed and levelled in the sloughs themselves.

Secondly, the County argues that these sloughs do not qualify as "waters of the United States." The United States maintains there is jurisdiction under the CWA over the sloughs both under an adjacent wetlands theory and an isolated wetlands theory.

#### Adjacent Wetlands

■ The government's argument that the sloughs are "adjacent" wetlands strains any reasonable reading of the regulations. None of these sloughs are "separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes [or] the like." 33 CFR § 328.3(c). Neither are they "bordering, contiguous, or neighboring" any waters. *Id.* The Wild Rice River is seven miles of farmland from Meszarous, and over ten miles from Bruns and Big Sloughs. Those distances, when coupled with the relative significance of the Wild Rice in the area, cannot justify a finding of adjacency.[10]

This strained interpretation is more evident when 33 CFR § 328.4 is examined. If the three sloughs are adjacent to the Wild Rice, jurisdiction extends "to the limit of the adjacent wetlands," rather than just to the wetland itself. *Compare* 33 CFR

---

than that "parts" of the sloughs no longer contain water. The declaration does not indicate the size of the sloughs before or after the work was performed. Further, the paragraph only implies that parts of the sloughs have been farmed, and does not define or explain what exactly constitutes "non-wetland" use.

8. There is some reference to the recent drought in the record. *See* Deposition of Jeffrey Volk at p. 14, Exhibit 2 attached to docket entry # 123.

9. On a related vein, no evidence has been presented to show whether the sloughs were dry, or what size the sloughs were, in the 1920s after original work on the drain was complete.

10. Because these sloughs are not "separated from other waters of the United States by man-made dikes or barriers, natural river berms,

beach dunes [or] the like," and do not "neighbor" or "border" the Wild Rice, the government essentially argues that the sloughs are "contiguous" to the Wild Rice, due to their surface water connection with the river via Drain 11, or an historical surface water connection with the river. It strains logic to define contiguous in that manner. All the water in the eastern third of North Dakota, covered once by Lake Agassiz, has an historical surface water connection. The government's position, taken to its logical conclusion, would make all potholes and sloughs in the eastern third of the state wetlands adjacent to the Red River, and would lead to absurd results clearly not contemplated under the regulatory scheme.

§ 328.4(c)(2) *with* 33 CFR § 328.4(c)(3). Upon a finding of adjacency, that distinction only makes sense if all the farmland between the Wild Rice River and the farthest slough, Bruns, is considered within the limits of non-tidal waters jurisdiction. Most of western Sargent County would suddenly become the "Wild Rice River Wetlands Complex." This is an absurd result and clearly not contemplated under the regulatory scheme. Big, Bruns, and Meszarous Sloughs are not "adjacent" wetlands.

*Isolated Wetlands*

 Waters of the United States include isolated waters such as sloughs "the use, degradation or destruction of which could affect interstate or foreign commerce." 33 CFR § 328.3. The United States has established that these sloughs have provided habitat to migratory birds and that the sloughs could be used by interstate travelers for recreational purposes. Potential rather than actual use by interstate travelers for recreational purposes is enough to establish jurisdiction, and is one of the specific examples in the regulations of a sufficient interstate commerce nexus to bring a water within CWA jurisdiction. *Id.* at § 328.3(a)(3)(i).

 Congress intended to extend the CWA's jurisdiction to the constitutional limit. *See Minnesota v. Hoffman,* 543 F.2d 1198, 1200 n. 1 (8th Cir.1976) (*citing* legislative history of the Act). The main goal of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," including the protection of wildlife resources dependent on water. 33 U.S.C. §§ 1251(a) & (a)(2). Further, the Supreme Court has recognized that "[t]he protection of migratory birds has long been recognized as 'a national interest of very nearly the first magnitude'". *North Dakota v. United States,* 460 U.S. 300, 309, 103 S.Ct. 1095, 1101, 75 L.Ed.2d 77 (1983). While it is clear that these sloughs do in fact provide habitat to migratory birds, the Ninth Circuit has even suggested that "[t]he commerce clause power, and thus the Clean Water Act, is broad enough to extend the Corps' jurisdiction to local waters which may provide habitat to migratory birds and endangered species." *Leslie Salt Co. v. United States,* 896 F.2d 354, 360 (9th Cir.1990) (emphasis added), *cert. denied,* 498 U.S. 1126, 111 S.Ct. 1089, 112 L.Ed.2d 1194 (1991). The court determines that CWA jurisdiction exists over the sloughs in this case as isolated wetlands, both because of their importance to migratory waterfowl and because of their potential use by interstate travelers for recreational purposes.

*The Exemptions*

 The discharge of dredged or fill material for the purpose maintaining a drainage ditch is exempt from the CWA. 33 U.S.C. § 1344(f)(1)(C). The issue in this case is whether the County's work constituted maintenance or whether it was new work requiring a permit. Maintenance requires that the original depth and bottom width of the ditch remain the same. *See United States v. County of Stearns,* No. 3–89–0616, slip op. at 19 (D.Minn. Mar. 15, 1990) (*Stearns County I*); *see also* 33 CFR § 323.4(a)(2) (any modification that changes the character, scope, or size of the original design is not maintenance).

 Whether the original condition of Drain 11 was maintained by the County remains a genuine issue of material fact. The court defines "original" condition as 1) the depth and width of the ditch as it was originally constructed, plus 2) any improvements made to any segments of the ditch prior to the CWA's jurisdiction over wetlands in 1975. *See United States v. Southern Investment Co.,* 876 F.2d 606, 613 (8th Cir.1989) (work performed prior to CWA jurisdiction over wetlands is grandfathered).

The survey information in the record does not establish the "original" condition of the ditch. In fact, the record does not even establish the depth of the last seven miles of ditch as it was originally constructed, let alone any improvements that may have been made prior to 1975. The 1919 survey only shows the recommended design of the last seven miles of ditch. The 1969 survey shows that even with silt fill-in, the ditch was deeper than the 1919 design. The 1969 survey also shows deeper depths than the 1919 survey in other areas of the ditch, raising an

inference that improvements were made to segments of the ditch after original construction.

The contractor, Radniecki, testified that experienced contractors can determine the bottom depth of a ditch by the difference in color between silt fill-in and virgin soil, and that the ditch was only returned to its pre-existing depth and original grade. This is probably the best evidence before the court on this issue. However, because there is no conclusive evidence showing the "original" depth of the ditch as that term has been defined by the court, this is a classic example of an issue than can only be resolved by a trier of fact.

The government strenuously argues that even if the County satisfies the maintenance exemption, the activity is "recaptured" under 33 U.S.C. § 1344(f)(2), which provides:

> Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

The record is replete with evidence that the County's only "purpose" in doing the work was to maintain the drain. The government argues, however, that it is the effect of the County's activity rather than the purpose, that should be the focus of the court's inquiry when determining whether the recapture clause applies. *See United States v. Stearns County*, slip op. at 10 (D.Minn. Oct. 2, 1990) (*Stearns County II* ) ("the effect of the project must be considered where a government entity's 'purpose' is analyzed.") The government argues the County has the burden of proof on this issue, and that because the County has failed to address the issue of effect, summary judgment for the government is mandated.

The County's position at oral argument was that the purpose of its activity, not its effect, is the key. If the proof shows that the project was strictly maintenance, then its purpose necessarily was not "bringing an area of the navigable waters into a use to which it was not previously subject," and the recapture clause does not apply as a matter of law. This subject was addressed at some length in *Stearns County I*. *See Stearns County I* at pp. 7–11, 14. That court rejected the argument made by Stearns County there and Sargent County here, and determined that "the court must look to actual past use" to determine if the recapture clause applies.

However, even under the government's interpretation of the recapture provision (which the court does not necessarily agree with), the court disagrees that summary judgment is mandated. Common sense dictates that, under normal conditions, ordinary maintenance would not subject an area to "a use to which it was not previously subject." There is a genuine factual issue whether the County's activities were strictly maintenance. Therefore, even though satisfaction of the maintenance exemption may not negate the recapture clause as a matter of law, at least it raises a factual inference that changes in the sloughs were caused by something other than the County's activities. That is entirely possible here given the recent drought the state (including Sargent County) has experienced, and enough to survive summary judgment.

*Moore's Control Over/Responsibility for the Work*

■ Liability under the CWA is predicated on either 1) performance of the work, or 2) responsibility for or control over performance of the work. *See United States v. Board of Trustees of Florida Keys Community College*, 531 F.Supp. 267, 274 (S.D.Fla. 1981). Moore argues that it did not exercise sufficient responsibility for or control over the work to be liable.

■ Moore's involvement in this case is essentially reduced to three main components. First, it provided drawings to the County which purportedly showed the pre-existing depth of the ditch. The record shows conclusively that Moore's drawings were not relied upon by the contractor. There are substantial variances between the drawings and the work that was actually performed. This is convincing evidence that Moore had little control over the work that was actually performed.

Second, it placed depth stakes in some areas of the ditch. However, in many areas the drain was not staked and Radniecki performed work without any direction from Moore. More significantly, the depth stakes were not critical to the performance of the work. Radniecki testified that for the most part he could establish on his own the depth of the ditch.

Third, Moore placed centerline stakes so that Radniecki could find the center of the drain in areas where it was not easily discernible. However, again in many areas the drain was not staked and Radniecki performed work without any direction from Moore. More significantly, the centerline of the ditch is not critical to the issues in this case, i.e., the depth of the ditch and the placement of excavated material.

More significant is what Moore did not do. The County did not retain Moore for the purpose of obtaining any permits. Moore did not prepare any specifications for the contractor, it was not involved in the bidding, it did not administer the contract, it did not conduct any inspections of the contractor's work during or after construction, and it did not approve payments to the contractor. Moore's drawings did not contain any instructions about the placement or disposal of the silt removed from the ditch during clean out. Moore was not asked to make any determination or give any instructions about the placement of the material, nor did it give any such instructions.

Three cases have been cited by the parties as relevant to determining Moore's liability as a consulting engineer in this case; *United States v. Board of Trustees*, 531 F.Supp. 267 (S.D.Fla.1981); *United States v. Weisman*, 489 F.Supp. 1331 (M.D.Fla.1980); and *Stearns County I*.[11] After consideration of those cases, the court agrees that Moore's involvement in this case is too attenuated for liability to attach.

In *United States v. Board of Trustees*, the consulting engineer was not even named a party to the action. The contractor's liability was based on actual performance of the work, not responsibility for or control over the work. *Board of Trustees*, 531 F.Supp. at 274. In this case, Moore did not perform any of the work, and had nothing to do with the placement of the excavated material. In *Stearns County I*, Chamberlain Engineering's involvement included arranging for a second engineer to obtain permits for the work from the Corps of Engineers, preparing bid documents concerning the transportation and placement of excavated material, and observing the work during construction. *See* Exhibit A attached to docket entry # 134. That is significantly different from the role of Moore in this case. In *United States v. Weisman*, the engineer was retained to design a roadway and obtain all the necessary permits. *Weisman*, 489 F.Supp. at 1334. After an initial application was denied, the engineer revised his design and communicated with the Corps of Engineers concerning construction. *Id.* at 1335. The engineer prepared drawings for work that was entirely new construction, not maintenance. *Id.* That is significantly different from the role of Moore in this case.

Moore was not hired to obtain any permits, but to provide a drawing to the County showing the bottom elevation of the ditch, a drawing which in any event was not followed by the contractor. Moore's mere placement of stakes in parts of the ditch was not that critical to the performance of the work. Finally, Moore had nothing to do with the discharge of the dredged material and Moore exercised no control over the contractor's performance of the work. Under these circumstances, Moore's "authority over [the work] is too far beyond the pale of a requisite connection with the instant controversy to warrant imposition of [liability]." *Love v. New York State Dept. of Environmental Conservation*, 529 F.Supp. 832, 842 (S.D.N.Y. 1981) (*citing Montgomery Environmental Coalition v. Fri*, 366 F.Supp. 261, 267 (D.D.C.1973)).

*Motion to Bifurcate*

After due consideration of the government's motion to bifurcate the issues of liability and damages for trial, the court agrees that bifurcation is appropriate.

---

11. The district court's opinion in *Stearns County I* does not contain any description of the consulting engineer's duties. However, those duties are explained in the government's brief in that case, which has been filed with the court as Exhibit A to docket entry # 134.

Therefore,

**IT IS ORDERED** that the motion to bifurcate (docket entry # 97) is **GRANTED.**

**IT IS FURTHER ORDERED** that the United States' motion for summary judgment (docket entry # 101) is **DENIED.**

**IT IS FURTHER ORDERED** that Sargent County's and the State of North Dakota's motion to dismiss (docket entries # # 103, 115) is **DENIED.**

**IT IS FURTHER ORDERED** that Moore Engineering's and the State of North Dakota's motion for summary judgment on Moore's liability (docket entries # # 104, 115) is **GRANTED.**

See also 876 F.Supp. 1081.

**IT IS FURTHER ORDERED** that the United States' motion to strike the affidavit of Cary Backstrand (docket entry # 137) is **DENIED.**

**IT IS FURTHER ORDERED** that a pretrial conference is hereby scheduled for Friday, May 8, 1992, at 10:30 A.M., in the third floor courtroom of the Federal Building and U.S. Courthouse, 655 First Avenue North, Fargo, North Dakota, to discuss whether in light of the court's rulings, additional time is needed for discovery or pretrial motions or whether this case can be set for trial.

