**In re Terence N. CARSTEN, d/b/a Sandstone Llama Co. & Llamas, d/b/a Llattes and Llodging, and Greta C. Carsten, d/b/a Sandstone Llama Co. & Llamas, d/b/a Llattes and Llodging, Debtors.**

Bankruptcy No. 96–51744–12.

United States Bankruptcy Court,
D. Montana.

July 1, 1997.

Victoria Francis, Assistant U.S. Attorney, Billings, MT, Daniel R. Dertke, Environmental Defense Section, U.S. Department of Justice, Washington, DC, for U.S. E.P.A.

John P. Paul, Terrence M. Healow, Alexander, Baucus, Taleff & Paul, P.C., Great Falls, MT, for Carstens.

## ORDER

JOHN L. PETERSON, Chief Judge.

In this Chapter 12 bankruptcy, after due notice, hearing was held April 8, 1997, at Missoula on the Objection to United States Proof of Claim, filed by Debtors on February 26, 1997. The $125,000 Proof of Claim, filed February 13, 1997, asserts Debtors have committed illegal dredging and filling of Altenburg Slough, under the Clean Water Act, 33 U.S.C. § 1344. Debtors listed the claim in their Schedules as "disputed." Debtors and United States of American, Environmental Protection Agency, ("EPA") filed prehearing briefs in support of their respective positions. At hearing, the Chapter 12 Trustee appeared in person as did Debtors, who were also represented by counsel. EPA appeared through its agent and was represented by the U.S. Department of Justice. The parties introduced substantial testimonial and documentary evidence into the record. On behalf of Debtors, testimony was given by Mike Fraser, Laney Hanzel, and Richard Blodnick, and by both Debtors. EPA offered the testimony of Kevin Shelley, Robert Henke, John Brink, Doug Miller, and David Brewer. Exhibits 1–8 and 9 were admitted into evidence without objection. After identifying a need for supplementary evidence, the Court held a second evidentiary hearing, after due notice, on June 3, 1997. At the second hearing, the parties presented the testimony of Debtor Terrence Carsten, Myrna Foy, Charles Brasen, Roger Noble, John Thomas Blaine, Robert Henke and James

Reilly. Exhibits 10–25, and J–R were admitted into evidence. Upon close of the second hearing the Court granted the parties time to submit memoranda of law in support of their respective positions, and the matter was taken under advisement. The matter having now been fully briefed, the matter is ripe for decision.

The parties dispute a series of issues. For instance, EPA claims Debtors had responsibility for and controlled, as agents of the landowner who ordered the work done, a dredging operation that included a "discharge" of "pollutants" into Altenberg Slough, an alleged "water of the United States." EPA also accuses Debtors of recalcitrance in their subsequent interactions with it and the Army Corps of Engineers ("ACE"). EPA further argues Debtors engaged in the dredging and alleged discharge without first obtaining a permit to do so. Finally, EPA asserts that the Court need not estimate its unliquidated claim for purposes of confirmation of the Debtors' Chapter 12 Plan, which in its brief contends must contain $25,000 for restoration of the wetland, to be expended in the first year, and $13,000 for an administrative penalty to be paid in the second year. For their part, Debtors dispute the foregoing, particularly the issue of whether Debtors committed a discharge for the purposes of CWA, and pursuant to 11 U.S.C. § 502(b) and (c), request in the alternative, that the Court either disallow EPA's claim, or estimate it to reflect only their portion of any liability. Finally, the issue arises whether the dredging of Altenberg Slough qualifies for the farming exemption from the permit provisions of the Clean Water Act.

## I.

The Court finds the facts as follows. During 1993 and 1994, Cuyler P. Medore ("Medore"), operated a llama ranch, know as the Sandstone Mountain Ranch, on two tracts of land located in Section 13, Township 27 North, Range 21 West, Flathead County, Montana, upon which is located the north end of a completely enclosed body of water known as Altenberg Slough. Medore had earlier purchased the property from Myrna Foy, who bred horses there. During his ownership of the ranch, Medore employed Debtor Greta Carsten ("Greta") as llama manager for the operation. (April Tr. p. 13; Exhibit 7.) Greta's spouse, Debtor Terrence N. Carsten ("Neil"), lived on the premises with his wife but had no employment relationship with Medore or the Sandstone Mountain Ranch. (April Tr. p. 13.) Then, in May and June of 1994, Debtors purchased the ranch from Medore.

Before Medore and Debtors ever discussed Debtors' purchase of the llama ranch, however, Medore had arranged for some dredging on the property on the north end of Altenberg Slough. (April Tr. pp. 12; 50–51.) This part of the slough contained a shallow marsh, replete with the bullrushes and cattails typical of emergent wetlands, with a small shallow area of open water on its southern border. Prior to Medore's ownership, during especially wet seasons when the reach of the open water expanded, Myrna Foy's horses had used the slough for opportunistic watering. (June Tr. pp. 55–56; See Exhibits N and U.) Later, llamas watered from it on the same occasional basis. (June Tr. pp. 8–11, 19, 55–56.) In the spring of 1993, to increase the dry season use of the open water such that livestock could drink from it on a regular basis, Medore proposed creating from the marsh a relatively large pool of open water. (*E.g.*, Exhibit A; Exhibit R; June Tr. pp. 97–98). Medore designed the project to deepen and widen the wetlands on the north end of the slough by the use of dredging. By March of 1994, he had constructed a large pond where only a shallow swamp existed before. From this record, the Court specifically finds that Medore digging constitutes construction a farm pond from an area of emergent wetlands, and that the project has had the effect of converting such wetlands to open water containing low islands within its reach. In addition, according to Kevin Shelley, a U.S. Fish and Wildlife Service ("FWS") scientist—who has done migratory bird studies at the slough—the dredging has also the effect expanding the marsh from an environment supporting only indigenous local species, to a habitat preferred by migratory game birds as well.

(April Tr. p. 90, 97, 101; Exhibit 4, p. 2; Exhibits 19–25.)

Moreover, the Court finds the pond construction did not interfere with the fundamental hydrological nature of the slough. As Laney Hanzel confirmed at the April 8, 1997, hearing, local hydrological overseers such as Roger Noble, a Montana Department of Natural Resources hydrologist, believe the dredging would not have had and did not have any detrimental effect any aspect of Altenberg Slough. To the direct contrary, construction of the pond enhanced the flow circulation and water percolation of the effected wetland areas, as well as the surface area and volume of the open water. (April Tr. pp. 63–64; June Tr. pp. 96–98.) Likewise, as a spring fed "enclosed basin" with no known surface inlet or outlet connecting it to any other above-ground body of water, (e.g., April Tr. pp. 51; Exhibits 19–25), neither Altenberg Slough, nor Medore's dredging there, had any impact whatsoever, no matter how tenuous, on the level or flow of any nearby surface waters.

As to the control of the work, the project was done not at Debtors' will, but entirely at Medore's specific request (although he did not conduct the entire project in person). (April Tr. pp. 13–14.) For instance, Greta, the "llama manager," signed an agreement on behalf of Sandstone Mountain Ranch engaging the services of a consulting firm to prepare a permit application for the work. (Exhibit B.) The record establishes, however, that she had no oversight or control over the dredging operation itself. Moreover, Neil Carsten, acted as a go-between for Medore, relaying Medore's wishes to the engineers, Thomas, Dean & Hoskins, Inc. ("TDH"), to the contractor, Doug Miller ("Miller"), and to David Brewer ("Brewer"), the excavator operator Miller employed to actually perform the work. (April Tr. p. 121, 127.) Nonetheless, the evidence shows Neil neither asked for, nor received, any remuneration for his services. More important, Neil took no leadership in the project and exercised no position of supervision, first because he had no expertise in any of the technical aspects of the project, (June Tr. p. 16), and second because he had neither ownership interest in

the farm the pond would serve, nor any employment relationship with Medore. In short, in the planning and construction of the slough pond, Medore made all substantive decisions, while Neil had no authority whatsoever.

Some specific events serve to illustrate Neil's role. For instance, the idea for the islands came from Medore after he saw similar conditions on environmental remediation projects near Deer Lodge and Anaconda, Montana. On seeing these, Medore phoned Neil and asked him to have the contractor leave islands in the farm pond. (June Tr. p 12.) Later, about two weeks into the excavations, Medore ordered the project ceased, citing costs concerns. Only when Miller assured Medore payments could be made over time did he order a resumption. (April Tr. p. 17.) The record contains only one occasion where Neil made a decision with regard to the pond construction. Neil had asked the excavator operator to leave a "land bridge" from the bank of the pond to one of the islands for worker access. Upon learning of this, however, Medore curtly vetoed Carsten's decision, ordering the causeway removed. (April Tr. pp. 132.) Furthermore, Medore initially sought bids personally from local contractors to dredge the slough. In response, the contractors inquired whether Medore had obtained permits to do so, which he had not. (April Tr. p. 13.) Having to leave for Texas thereafter, however, Medore asked Neil to contact Medore's Montana attorney to begin applying for permits. Neil only agreed to provide this aid as a courtesy to a friend who was also his wife's employer. (April Tr. pp. 13–15.) In addition, at no point before, during or after did Neil or Greta make any payments of any kind for the planning or completion of the dredging. (April Tr. p. 17.) Only Medore, as owner of the property, approved and paid the bills for the work, (April Tr. p. 43), Miller, the contractor, took his orders from Medore, as "the guy paying the bill." (April Tr. p. 123.) Only after they purchased the ranch did Debtors agree to help in the spoil removal.

In order to obtain Medore's permit, upon referral by Medore's attorney, Neil contacted a local engineering firm, TDH, who eventual-

ly prepared a permit application. (April Tr. p. 14; Exhibits A and B.) The Court notes the permit application contains a number of errors. For instance, TDH apparently instructed Neil to sign the application under block 3, where Medore's signature, as the applicant listed in block 2, should have appeared. In addition, Neil signed page 2 over "signature of agent." Here the signature should have been that of the "duly authorized agent if the statement in block 3 has been filled out and signed." The authorization statement in block 3, however, remains blank. Medore's signature never appears in either block 3 or on page 2 over "signature of applicant," and thus, neither he nor his purported agent have ever properly executed the permit application in accordance with its instructions. The Court also notes, however, that Neil did not prepare the application. Rather, one of TDH's engineers, Mike Fraser, accomplished this, inserting his and TDH's name and TDH's address in Block 3 of the application as "Authorized Agent," and C.P. Medore's name under block 2 as "Applicant." (April Tr. p. 47; Exhibit A.)

Despite the errors in the execution of the application—and therefore the questions as to its proper authorization—however, on March 24, 1993, Robert E. McInerney, State Supervisor for the Helena Regulatory Office of ACE ("McInerney"), issued "No Permit Required Letter 199390131" (hereinafter "NPR letter"), addressed to Medore—not Debtors—as the permit applicant. (Exhibit 1.) The basis for such issuance is not altogether clear, however, and McInerney was not called as a witness at either evidentiary hearing. The ambiguity arises from the following statement: "Based on the information provided *and your statement that no fill material will be placed either temporarily or permanently in a wetland or other aquatic area*, this office has determined that no Department of the Army permit is required for this project." (Exhibit 1, emphasis added.) This passage notwithstanding, review of the application for permit, (Exhibit A), and the rest of the record reveals no evidence that Medore, Neil or Fraser ever made such a statement, either orally or in writing. While the application does state that "all material will be wasted in areas outside the flood plain

and outside areas characterized as wetlands" this alone does not give rise to implication that "no fill material will be placed either temporarily or permanently in a wetland or other aquatic area." The permit application clearly does not preclude the possibility that the waste might be set aside for drying prior to its ultimate disposal. Indeed, given the lack of any reference to permanent versus temporary spoil disposal in the permit application, only McInerney's contemplation of such a possibility could explain the temporal reference in the NPR letter. Such contemplation should have led him, the government's agent responsible for the issuance of CWA permits, to inquire with the applicant further for clarification. The Court finds the substance of the letter, together with its total disregard for the errors in the execution of the application, implies that McInerney ignored the application in issuing his NPR letter. The record establishes that instead of carefully analyzing the application and investigating the discrepancies contained therein, ACE misconstrued or flatly ignored crucial features of Medore's application—including its erroneous execution and that in fact the application did *not* specifically state that waste would not be temporarily allowed to stand upon wetlands—when it issued its NPR letter.

After McInerney issued the erroneous NPR letter, in December of 1993, or January of 1994, Miller began work on the slough, employing Brewer to run the excavating machine. (April Tr. pp. 16, 123, 127.) Neil relayed Medore's wishes to Brewer concerning the size and shape the completed pond should take. (April Tr. p. 16.) At the outset, Medore had planned to remove the dredged material to an upland disposal site immediately upon its removal from the slough. These plans changed after commencement of the project, when the work progressed so slowly that at some point Medore asked Neil to inquire with Miller or Brewer for an explanation. Brewer advised that the loose spoil was wetter than Miller anticipated, and would have to dry until summer before it could be moved efficiently to an upland "final resting place." (April Tr. pp. 34–35.) After this decision, Miller continued

work leaving the spoil near the pond's banks until March of 1994, at which time spring thawing made the ground too soft for further operations. (April Tr. p. 18.)

The day after Miller removed his equipment, representatives of ACE and other government agencies appeared on the scene to investigate possible violations based on a complaint by a neighbor. (April Tr. p. 18; 94.) Upon this inspection, the investigators informed Neil that they believed the operation had been done improperly in that islands had been left in the water and dredge materials had been discharged near wetlands, and conveyed to Debtors that all such work should cease. Later, in June of 1994, after Debtors had purchased the ranch, Neil moved some waste to contour borrow pits on the property. ACE reacted immediately, phoning to tell him to stop, and to inform him that he should contact EPA before taking further action. Upon inquiry, EPA told Neil that not only could no more disturbance of the slough or wetland occur, but that none of the waste, no matter where deposited, could be in any way touched until further notice. (April Tr. pp. 20–21.) ACE followed-up these conversations with a formal "cease-and-desist" letter. (Exhibit 6.)

Despite ACE's and EPA's allegations, however, the Court finds Medore's contractor placed no spoil atop wetlands on the east side of the slough, where he placed the vast majority of the deposits. Furthermore, although the contractor did place spoil on wetlands on the west side of the slough, and built deposits up within the open water to create islands, had the government allowed Debtors to remove the spoils after they purchased the property in June of 1994, the Court is satisfied from Neil's testimony, and from his efforts to properly dispose of the spoil at the time, that Debtors in fact would have removed the waste to an upland disposal site in late June and early July of 1994—in other words—immediately upon Debtors' purchase of the property. (April Tr. p. 35.) On the other hand, when Neil made concrete efforts to this end in June of 1994, *ACE and EPA ordered him to stop.* Thus, it was the government agencies that intentionally and emphatically prevented the movement of the

spoil material in July of 1994 to a permanent upland disposal site. Absent this interference by EPA, spoil would not have remained atop either bank of the wetland—as now complained of by EPA.

As to decision making for and management of the pond construction, the Court specifically finds Medore (1) owned the slough; (2) ordered the work done; (3) insisted islands be left in the slough as he had seen on an environmental project near Anaconda, Montana; (4) paid the engineering firm which prepared the application for the dredging permit; (5) paid for the actual work; (6) at one point ordered the work shut-down because of cost concerns; (7) ordered the dredging resumed upon reaching a repayment agreement with the contractor; (8) ordered a land bridge that had been built to an island in the pond taken out; and (9) directed the waste be left standing on the banks of the slough to drain for later removal. Thus, Medore made the decisions on the project, while Greta and Neil merely carried out a few of his wishes, which activities entailed little more than relaying messages between Medore to Medore's engineering firm and contractor. As mere conduits for the wishes of Medore to Miller, the party actually performing the construction, Debtors had at most nominal control or responsibility for the dredging operations at Sandstone Mountain Ranch—if that. Instead, the Court finds Debtors made no decisions on how, where, or when to make the alterations to Altenberg Slough, and undertook no responsibility whatsoever—in either Medore's or their own behalf—to finance or oversee the proper construction of the stock pond eventually built there. The Court further finds that excavator operator Brewer, the agent of construction contractor Miller, did the actual dredging and depositing of spoil materials.

The Court notes at this point that no direct evidence establishes whether Medore, Miller or Neil took the decision to leave the spoil to drain near the banks of the pond. From the previously related direct facts, however, including that Neil was not employed by Medore, had no position of supervision or authority over the pond construction, and that Miller stated that he took orders from the

person paying the bills—that is, Medore—the Court infers that neither Neil nor Greta acted as the decision maker on the question to drain the spoil. Given Debtors' lack of authority over all the other aspects of the operation, the record strongly implies that Medore would not have given Debtors charge solely of this one decision—especially one, even in foresight, so important to the ultimate cost of the project. In addition, nothing appears in this record to suggest that once the decision was taken, either Neil or Greta could have countermanded or reversed it prior to their subsequent purchase of the property. As has been shown, however, once they did purchase the property, they made efforts—which the government thwarted—to remove the spoil.

In addition, the Court finds from the record that Debtors have obeyed all the government's orders—no matter how overbearing or contradictory such orders may have been—to the best of their ability and in complete good faith. Neil sought permits for the work on Medore's behalf, yet no intentional deception arose from the application itself, which TDH—not Debtors—prepared. Furthermore, neither the application nor ACE's authorization included a date certain for the commencement of the project, so any delay between ACE's issuance of the NPR letter and the date dredging began cannot aggravate the circumstances of the alleged violation. Only after ACE issued its NPR letter did Miller begin work. Later, when ACE told Debtors not to disturb the slough or wetland further, they did not. When they began to move the discharges placed on the pastureland and ACE objected, they immediately stopped and, as instructed, called EPA for further clarification. EPA told them not to touch anything else, and they did not. EPA did order Debtors later to perform remediation. This, however, would have been in direct violation of ACE's cease and desist letter which it never rescinded. Indeed, on cross-examination, counsel pointedly gave EPA Region VIII Section 404 Enforcement Manager, John Brink ("Brink") the specific opportunity to characterize Debtors' actions as other than good faith. Yet Brink dissembled, steadfastly refusing to expressly level the charge of bad faith against Debtors

in open court. The Court infers from the Brink's evasive response that in fact not even EPA's own managers view Debtors' actions as less than cooperative. (April Tr. pp. 118–119.)

On the other hand, the government's treatment of Debtors has been little short of capricious. For instance, ACE—which should act as a careful expert in regulatory matters such as these—misrepresented the substance of Medore's application, ignoring its substance as well as its improper execution when McInerney issued his NPR letter. After Medore proceeded in reliance on the letter, however, ACE—prodded by what on this record was an anonymous tip—realized its mistake and descended on the llama ranch, accusing Debtors of violating federal law. In addition, as heretofore related, ACE's has forbade Debtors from removing any dredge material from the slough or its surrounding wetland in a stem and broad sweeping "cease and desist" letter that it has yet to rescind, (Exhibit 6), at the same time as EPA has bullied Debtors by threatening them with daily accumulating civil penalties for violation of the Clean Water Act by failing to properly remove and dispose of dredged wetland material. (Exhibits 3, 4, 5, and 9). These irreconcilable agency actions make EPA's assertion that "all of the illegally discharged pollutants have remained in the wetlands" as a basis for imposing $125,000 fine against Debtors especially outrageous and disturbing. (Exhibit 4, p. 1.)

Further, EPA demands restoration of the slough to pre-dredging conditions, "*under the supervision of the Corps of Engineers.*" (April Tr. p. 115; Exhibit 3, p. 2 (emphasis in original).) But, this remediation would require dumping the dredged material back into the slough—in violation, once again, of ACE's still effective cease and desist letter—damaging water quality and endangering springs. In addition, as EPA's agent John Brink admitted, such dumping would itself constitute a discharge as defined under the Clean Water Act. (April Tr. pp. 53, 62, 114.) Presumably ACE will require a properly executed application for permit before any dumping could begin. Thus, EPA proposes to fine Debtors tens of thousands of dollars

for allegedly doing without a permit what ACE expressly told them did not need a permit—and which EPA has subsequently ordered done. These government agencies would do well to bear in mind the admonishments of Mr. Justice Frankfurter, who warned:

> "An executive agency must be rigorously held to the standards by which it professes its actions to be judged.... This judicially evolved rule of administrative law is now firmly established and, if I may add, rightly so. He that takes up the procedural sword shall perish with that sword."

*Vitarelli v. Seaton,* 359 U.S. 535, 547, 79 S.Ct. 968, 976, 3 L.Ed.2d 1012 (1959) (citations omitted).

The litany of government conceit, however, does not end here. In addition to the agencies' relentlessly arbitrary treatment of Debtors already set forth, EPA also has dubious bases for its proposed fine. For instance, on January 26, 1996, EPA project officer, Dick Blodnick ("Blodnick"), co-authored and signed an Analysis of Penalty Assessed in Complaint in the Altenberg Slough Case (hereinafter "Analysis"). (Exhibit 4.) In analyzing Debtors' "ability to pay," which must be considered in determining an administrative penalty under § 1319(g)(3) of the Clean Water Act, the Analysis reads:

> [Debtors] have not presented any information to EPA that addressed their ability to pay. However, in view of the apparent financial resources required to own and operate a llama ranching business such as the Sandstone Mountain Ranch, and in the absence of evidence of an inability to pay, the $125,000 penalty EPA is seeking is within the ability of [Debtors] to pay.

(Exhibit 4, p. 4). Prior to this evaluation, however, EPA never requested any financial information from Debtors. (April Tr. pp. 21–22, 39.). Blodnick admitted that as of the hearing date, he still has no knowledge of their financial ability to pay. (April Tr. pp. 72–73.) Further, despite being the sole signatory to the document, Blodnick claimed ignorance on several key issues involved in calculating the penalty, including economic factors. The Court finds that Blodnick's mendacious account reveals either an unconscionable amount of confusion on his part about the bases for the Analysis, or a conscious effort to conceal the true methods used in its preparation. (E.g., April Tr. p. 71, 73.) Blodnick's testimony, both in substance and demeanor, compels a finding that EPA arbitrarily based the foregoing passage from page 4 of Exhibit 4 on the most tenuous speculation.

Furthermore, not only does this conclusion cast grave suspicion over the entire Analysis, but so do other inaccuracies contained therein, and consequently, on EPA's Proof of Claim. Paragraph B on page 3 of the Analysis relates that Neil filled a borrow pit with wasted dredge materials after EPA told him not to. In fact, however, Neil stopped the transfer after being told by ACE not to proceed further, and ensured no more material was moved after personally contacting EPA on ACE's reference. (April Tr. p. 20–21). The Analysis also places a "high degree of culpability" with Debtors for temporarily placing spoil materials in and on the banks of the wetland. The notion that no spoils would be placed even temporarily in this manner arises as much from ACE erroneous evaluation of the application, however, as from any other source. Since Medore's initial plan was to remove the spoil immediately, it was reasonable to pass over ACE's qualification with little note. Medore's slight change in plan to allow the spoil to drain before removing it, brought about by subsequent events, would not necessarily have caused Medore, Debtors, Miller or any other reasonable person to resubmit a permit application on a project that ACE had already said did not require a permit. Moreover, Brink's absolute unwillingness to characterize Debtors' actions as constituting bad faith conclusively belie the assertion on page 4 of the Analysis that Debtors were "recalcitrant in complying" with EPA mandates. Instead, the record implies EPA fabricated its characterization of Debtors' conduct to justify the strong enforcement posture it decided to take against them.

Likewise, because no time frame appears in either the permit application or the NPR letter, the Analysis' citation to "delayed ...

excavation and dredging," (Exhibit 4, p. 4), serves not as a basis for Debtors' "degree of culpability," but as a mere pretext to justify EPA's filing of an administrative complaint. Indeed, while EPA condemns a nine month lapse between issuance of ACE's NPR letter and the beginning of dredging—where neither the application nor ACE's NPR letter ever designated a proposed time frame—it is EPA that has mooted its ongoing administrative actions against Debtors by now filing a complaint against them in U.S. District Court in April of 1997, over three full years since government agents arrived on the llama ranch to investigate Debtors' alleged violations. On these facts, which party is more culpable of delay? Finally, EPA offered no basis at hearing for its estimate that Medore received a benefit of $67,451 by allowing the wet spoil to drain rather than immediately removing it to its final disposal site. (Exhibit 4, ¶ D.) In addition, since Debtors never had a duty or obligation to pay the contractor to remove the material—and never made a representation to ACE in the permit application that they would so pay or in any other way be responsible for costs or oversight of the project—it cannot now be said that they benefitted from its non-removal.

Other evidence also calls into question not only EPA's methods, but more important, the merits of its Proof of Claim. Mike Fraser, a professional engineer with expertise in dredging, spoil disposal and the like testified that while the costs of restoring Altenberg Slough to its original state prior to the dredging would run between $67,000 and $70,000, simple removal the dredge spoils, such as was contemplated in the original application for permit, would cost "significantly less than that." (April Tr. p. 54.) Laney Hanzel, a retired state biologist with over 30 years experience testified that placing the waste materials in their original state would endanger existing springs, and to the effect that if spoils were so replaced, taking every precaution to attempt to save the springs would add greatly to the expense. (April Tr. pp. 63–67.) This testimony implies that the least cost method of restoration, removal of waste in conformance with the original permit, would also entail the least danger to the very existence of the Altenberg Slough—EPA's purported goal. Subsequent to EPA's original Analysis, Hanzel had to implore EPA to take the health of the springs into account in its remediation plan. EPA, as the federal agency charged with protecting the environment, should have consulted with knowledgeable local experts and made this determination *before* ordering actions that would threaten the resource. Its failure to do so raises serious doubts about the basis for its Analysis, remediation plan, and Proof of Claim.

EPA's own outside consultant, Henke, indirectly contradicted Hanzel, at least to the extent that he agrees with EPA's firm position that "the dirt go back in the slough." Moreover, Henke stated he believes water circulation has been effected by the dredging. (*E.g.,* June Tr. p 124; April Tr. pp. 82–83.) Henke's testimony lacks a good deal of credibility, however, because he formed his ultimate opinions prior to his on-site inspection, as Hanzel's did not. (April Tr. pp. 60, 80–81, 84.) Rather than data specific to Altenberg Slough, Henke's original account, in the April hearing, consisted mainly of generic information relating to wetlands generally. The few specifics to the instant site he did relate, he based on aerial photographs and long-distance viewing from a neighboring property. Thus, even though Debtors never refused access to any government official who may have asked for access to the slough, Henke did not bother to make a first-hand visit, (April Tr. p. 132), until much later, in preparation for the June hearing, at which point, Henke had already formed the strongly held opinion he related to the Court in the April hearing. Then, at the June hearing, Henke stated on direct examination only information in support of that opinion, and withheld from the Court, until cross-examination, observations tending to undermine EPA's position. Furthermore, Henke's manner of giving qualified testimony and less than direct answers to the direct questions of both counsel and the Court seriously undermines his overall credence. Thus, the Court finds Hanzel's recommendations, which he based on first-hand inspection and analysis, as well as upon consultations with other local experts familiar with Altenberg Slough, more

worthy and authoritative with regard to the instant dispute.

The same holds true for the contest of weight and credibility between Henke's testimony and that of hydrologist Roger Noble. Noble testified as agent of the state of Montana—a neutral third party to the instant litigation, whose future employment does not depend on the will of either Debtors or EPA. Further, Noble testified at trial with a frank and guileless demeanor, answering questions without hedging, qualifications or contradiction from the record. Just as important, with regard to effects the dredging operation had on the local hydrological regime, Henke is an expert in wetlands science, while Noble is a hydrologist. Thus, by training and profession, Henke may have greater expertise in judging the health of the wetland's fauna, flora and ecology, Noble has greater expertise in opining as to what effect Medore's pond construction had upon the hydrology of the slough—specifically the impact the dredging had on the flow, circulation and reach of the waters there.

Finally, at the June hearing, Henke said he found spoil placed atop cattails at the edge of the slough. (June Tr. pp. 122–124). Nevertheless, another of EPA's own witnesses, David Miller, the person who actually ran the excavator, testified that he placed dredge materials "on the edge [of the pond] just off of the edge of where the cattails were." When asked specifically whether he placed spoil materials "within the slough itself," he replied that the only materials placed in the slough were those placed on the islands. Thus, yet again, the Court finds Henke's testimony contradicted by a credible first-hand account.

EPA's other expert, Kevin Shelley, an agent of the U.S. Fish and Wildlife Service ("FWS"), testified that prior to the dredging, he had done studies at the slough, including species counts and other scientific research, and that the slough constitutes such good migratory waterfowl habitat that the FWS uses it as a reference site by which to judge other wetlands. (April Tr. pp. 90–91.) When asked if the habitat was "better or worse" after the dredging, however, rather than answer directly, Shelley felt the need to ask the evasive question: "Can you define 'better or worse?'" (April Tr. p. 97.) Then, even as Shelley proceeded with his less than unqualified answers, his demeanor appeared to indicate he had more doubt about his responses than he wanted to admit. (April Tr. p. 97–99.) In addition, Shelley based his opinions, tentative as they were, on only one actual visit to the site after the alleged violation. (April Tr. pp. 99–100.) Shelley indicated the post-impact conditions could easily have increased the value of the slough for migratory bird habitat, although it might also have decreased its value as marsh wren habitat. Thus, he said, such an evaluation "depends on the species." (April Tr. p. 101.) Shelley also admitted on cross-examination, however, that no government agency bothered to do any post-impact analysis whatsoever as to the number of species and individuals within species present in the slough after the dredging. (April Tr. p. 100, 102.) Thus, even though based on the purported "gravity of the violation," (Exhibit 4, p. 2), EPA regards Debtors' acts egregious and important enough to warrant inflicting a $125,000 fine on two ordinary citizens, the agency did not go to the trouble of making an actual field survey to evaluate whether and to what extent its experts' speculations about the harm the dredging caused may have proved untrue. (April Tr. p. 100.)

Moreover, when finally an EPA expert, Henke, did visit the site to make relevant measurements, he reported that he saw many birds in the non-dredged bullrushes and cattails, but only a coot on open water of the pond. (Tr. 127.) On cross-examination he even went as far as to say he "saw Canadian geese, but I didn't see nesting Canadian geese." (Tr. p. 151). Debtors, however, took photographs the same weekend Henke says he studied Debtors farm pond by on-site visit. (Exhibits 21, 22 and 23.) These photos clearly show Canadian geese with goslings too young to fly. Yet Henke denies seeing any. His failure to both detect and report such phenomena raises serious doubts about either his candor or his ability to make objective observations.

In sum, EPA has done little scientific study of Altenburg Slough post-impact. It

has no scientific evidence as to what impact the dredging has had on the species ecology of the slough in terms of costs to one species or benefits to another, or in terms of any other pertinent standard including the Shannon Weaver Diversity Index cited by Shelley in his testimony. (April Tr. p. 97). Furthermore, with one exception, none of its experts made any actual measurement of the impact the dredging did or did not have upon other ecological values, such as water flow, water quality, recreation and the like. The sole EPA witness to make such tests, Henke, did so only after he had already formed a firm opinion as to whether a violation had occurred. The Court finds Henke's observations in these regards deeply colored by what he expected to find, and by what EPA expected him to report, and therefore, of little credibility or weight. (See, e.g., testimony of Henke, April Tr. pp. 74–86.) Nor did EPA evaluate the impact its proposed restoration plans would have on these values. From the evidence presented at hearing in this matter, the case rests not on the supposed damage to Altenburg Slough, or on the alleged wrongdoing of Debtors (who clearly tried to cooperate with the contradictory orders of the different government agencies) and not on any harm to the slough—but on the fact that EPA "felt that taking an action would have important deterrent value in Montana where we have not had a very high enforcement profile." (April Tr. P. 117.) This state of affairs explains the reluctant, evasive demeanor of all of EPA's witnesses, who, with the exception of Brink, universally conducted themselves as if they had serious misgivings about their respective roles in this entire case.

The appearance of the agencies' (rather than Debtors') bad faith increases exponentially when one considers the weakness of EPA's evidence and the extent to which the government agencies involved here have contradicted themselves and one another. The high-handedness displayed in this matter betrays a disquieting image with regard to the competence of both ACE and EPA, and more pointedly, the motivations of the latter, which determinatively subverts the agencies' verisimilitude. Even absent the credibility gap, however—and more important—the bulk of the evidence presented at hearing either does not support, or flatly contradicts the factual allegations made by EPA in support of its Proof of Claim. Brink claimed in his testimony that EPA does not desire to run those out of business who have the ability and desire to comply with the Clean Water Act. Upon this record, however, the Court finds EPA concerned not with treating Debtors fairly, or even with preserving Altenberg Slough, but with instilling in the public a fear of its administrative tactics, which efforts it euphemistically labels "deterrence."

## II.

### A.

Under 11 U.S.C. § 502(a), "a claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, . . ., objects." If a party, such as a debtor, objects, however, a bankruptcy court, after notice and hearing, must determine the amount of the claim as of the petition date, and shall allow the claim only to the extent that it is enforceable "against the debtor and property of the debtor under . . . applicable law." 11 U.S.C. § 502(b). The objecting party bears the burden of going forward on the objection, but the claim filer has the ultimate burden of proof. Rule 3001(f), F.R.B.P.; *Wright v. Holm (In re Holm)*, 931 F.2d 620 (9th Cir.1991). As the Ninth Circuit Court of Appeals has espoused:

> If those allegations [in the proof of claim] set forth all the necessary facts to establish a claim and are not self-contradictory, they prima facie establish the claim. Should objection be taken, the objector is then called upon to produce evidence and show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves. But the ultimate burden of persuasion is always on the claimant.

*Id.* at 623; *In re Arthun*, 15 Mont.B.R. 174 (Bankr.Mont.1996). As to what constitutes a claim in the instant context,

> What might be called the "fair contemplation" test provides that "all future response and natural resource damages cost based on pre-petition conduct that can be

fairly contemplated by the parties at the time of [d]ebtors' bankruptcy are claims under [Bankruptcy] Code." *In re Jensen*, 995 F.2d 925, 930 (9th Cir.1993) (quoting *In re National Gypsum*, 139 B.R. 397, 409 (N.D.Tex.1992)).

For a claim in which a debtor disputes damages but not liability, or once liability has been established, if liquidation of the claim would unduly delay the closing of a reorganization case, a bankruptcy court has the authority to estimate the claim. 11 U.S.C. § 502(c). This Court has set forth the standards governing such estimation, instructing that " 'undue delay is not defined in the [Bankruptcy] Code; rather it is a problem "whose solution ultimately rests on the exercise of judicial discretion in light of the circumstances of the case." ' " *In re Chamberlain*, 10 Mont.B.R. 323, 326 (Bankr.Mont. 1992) (adopting language from *In the Matter of Interco Inc.*, 22 B.C.D. 734, 737, 137 B.R. 993 (Bankr.E.D.Mo.1992)). *See* 8 Lawrence P. King, *Collier on Bankruptcy* 1300.71[3][a], 1300.71[4] (1997).

### B.

#### 1.

■ Turning to the instant non-bankruptcy issues, Congress intended the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). "This purpose is to be achieved by compliance with the Act, including compliance with the permit requirements." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 315, 102 S.Ct. 1798, 1804, 72 L.Ed.2d 91 (1982) (footnote omitted). The Act prohibits persons from discharging dredged or fill materials into "waters of the United States" unless authorized by a permit issued by ACE pursuant to § 404. 33 U.S.C. §§ 1311, 1344; *e.g., Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 922 (5th Cir.1983).

Courts have imposed liability for CWA violations on persons who actually performed the work, or on those responsible for or in control of performance of work in violation of the statute. *See United States v. Lambert*, 915 F.Supp. 797, 802 (S.D.W.Va.1996); *United States v. Board of Trustees of Fla. Keys Comm. College*, 531 F.Supp. 267, 274 (S.D.Fla.1981). "Responsibility or control" has been found against a land owner who commissioned and paid for work in violation of CWA where the work "could not have been accomplished without [the owner's] express approval." *Lambert*, 915 F.Supp. at 802–803. "Actual performance" has been found against a general contractor who managed a project in violation of CWA. *Fla. Keys Comm. College*, 531 F.Supp. at 274.

■ On the other hand, a court found neither performance, nor responsibility, nor control against an engineering firm that was hired and accepted remuneration to provide drawings to a county agency to illustrate a prospective project, but where the drawings were not used on the actual project, and where the work performed could have been and was done without the firm's participation. *United States v. Sargent County Water Resource District*, 876 F.Supp. 1081, 1088 (D.N.D.1992). In *Sargent County*, the court found:

> More significant is what [the engineering firm] did not do. The County did not retain [the firm] for the purpose of obtaining any permits. [The firm] did not prepare any specifications for the contractor, it was not involved in the bidding, it did not administer the contract, it did not conduct any inspections of the contractor's work during or after construction, and it did not approve payments to the contractor. [The engineering firm's] drawings did not contain any instructions about the placement or disposal of the silt removed from the ditch during clean out. [The firm] was not asked to make any determination or give any instructions about the placement of the material, nor did it give any such instructions.

*Id.* Thus, where a party has no decision making authority, does not participate in the planning of a project, and whose will has no impact on a whether and to what extent dredge materials are discharged into waters of the United States, that party cannot suffer liability under CWA.

**2.**

█ The Ninth Circuit Court of Appeals has defined "waters of the United States" to include wetlands, which means, "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas." *U.S. v. Akers,* 785 F.2d 814, 818, fn. 2 (9th Cir.1986), *cert. denied,* 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986).

The court in *Akers* also pointed out certain limitations on the permitting requirement forth in § 1344(f), which provides in pertinent part:

> Limited exemptions from the permit requirement are found in Section 1344(f), which provides in pertinent part:
>
> > (f) Non-prohibited discharge of dredged or fill material (1) Except as provided in paragraph (2) of this subsection, the discharge of dredged or fill material——
> >
> > > (A) from normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices;
> > >
> > > \*   \*   \*   \*   \*   \*
> > >
> > > (C) for the purpose of construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches;
> > >
> > > \*   \*   \*   \*   \*   \*
>
> is not prohibited by or otherwise subject to regulation under this section. . . .

*Id.* at 818–819.

In recognition of the foregoing exemptions (referred to hereinafter as the "farmer exemptions"), the regulations promulgated pursuant to 33 U.S.C. § 1344 state that certain discharges, such as those associated with farming, silviculture, and ranching activities, are not prohibited by or otherwise subject to regulation under § 404. *See* 33 C.F.R. § 323.4. Turning to the Code of Federal Reg-

ulations, 33 C.F.R. § 323.4(a)(3) (1993) specifically provides that ACE does not require a permit for the "construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance (but not construction) of drainage ditches."

█ Section 1344(f)(2), however, contains an exception to the farmer exemptions (referred to hereinafter as the "recapture provisions"), which provides:

> (2) Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

*Id.* at 818. The Code of Federal Regulations implement the § 1344(f)(2) exception to the farm exemptions in the following manner:

> Any discharge of dredged or fill material into waters of the United States incidental to any of the activities identified in paragraphs (a)(1)–(6) of this section must have a permit if it is part of an activity whose purpose is to convert an area of the waters of the United States into a use to which it was not previously subject, where the flow or circulation of waters of the United States may be impaired or the reach of such waters reduced. Where the proposed discharge will result in significant discernible alterations to flow or circulation, the presumption is that flow or circulation may be impaired by such alteration. For example, a permit will be required for the conversion of a cypress swamp to some other use or the conversion of a wetland from silvicultural to agricultural use when there is a discharge of dredged or fill material into waters of the United States in conjunction with construction of dikes, drainage ditches or other works or structures used to effect such conversion. A conversion of a Section 404 wetland to a non-wetland is a change in use of an area of waters of the United States. A discharge which elevates the bottom of waters of the United States without converting it to dry land does not thereby reduce the reach of,

but may alter the flow or circulation of, waters of the United States.

33 C.F.R. § 323.4(c)(1993). Reviewing courts have broadly construed the recapture provisions of § 1344(f)(2). *See United States v. Huebner*, 752 F.2d 1235, 1240–41 (7th Cir.), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 50 (1985); *Akers*, 785 F.2d at 819; *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 926 (5th Cir.1983); *United States v. Cumberland Farms*, 647 F.Supp. 1166, 1176 (D.Mass.1986), *aff'd*, 826 F.2d 1151 (1st Cir.1987), *cert. denied*, 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 981 (1988); *United States v. Brace*, 41 F.3d 117 (3rd Cir.1994), *cert. denied*, 515 U.S. 1158, 115 S.Ct. 2610, 132 L.Ed.2d 854 (1995) The plain language of 33 U.S.C. 1344(f)(2) entails two clauses, one ("bringing an area of the navigable waters into a use to which it was not previously subject") modified by and subordinate to the second ("where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced"). The Code of Federal Regulations adds the following provisos: (1) "Where the proposed discharge will result in significant discernible alterations to flow or circulation, the presumption is that flow or circulation may be impaired by such alteration;" and (2) "[a] discharge which elevates the bottom of [a wetland] without converting it to dry land does not thereby reduce the reach of, but may alter the flow or circulation of, waters of the United States." 33 C.F.R. § 323.4(c). The structure of the language thus creates a two prong test, in which only satisfaction of the threshold issue—the impairment of flow, circulation or reach, can give rise to consideration of the second element of the two prong recapture provision—a substantial change in use of the wetland, such as "conversion of wetlands to dry land." *Akers*, 785 F.2d at 822.

■ On the latter issue, courts have often noted what Senator Muskie, whose opinion as primary sponsor of the Clean Water must be accorded substantial weight, said in Senate debate:

> New subsection 404(f) provides that Federal permits will not be required for those narrowly defined activities that cause little or no adverse effects either individually or cumulatively. While it is understood that some of these activities may necessarily result in incidental filling and minor harm to aquatic resources, *the exemptions do not apply to discharges that convert extensive areas of water into dry land or impede circulation or reduce the reach or size of the water body.*
>
> 3 *Legislative History of the Clean Water Act of 1977* ('Leg.Hist.') at 474 (Senate Debate, Dec. 15, 1977).

*Akers*, 785 F.2d at 819 (emphasis added). *See, also, Brace*, 41 F.3d at 128–129; *Huebner*, 752 F.2d at 1241; *Avoyelles Sportsmen's League, Inc.*, 715 F.2d at 897. Thus, where discharges of dredge materials or other activities impede water circulation, flow or reach of wetlands, such as in the draining of a bog or swamp for conversion to dryland farming, the § 1344(f) exemption provisions offer no refuge. *Akers*, 785 F.2d at 822.

Nevertheless, although court's have cited the foregoing passage to apply the farmer exemption narrowly, *id.*, and to allocate to the defendant the burden of establishing not only that the activities satisfy the requirements of subsection 1344(f)(1), but avoid the recapture provisions of subsection (f)(2) as well, *Akers*, 785 F.2d at 819; *Brace*, 41 F.3d at 128–129, the legislative history does not imply that all discharge activity in a wetland, even activity that has the effect of changing the wetland from one agricultural use to another, requires an ACE permit—provided that the activities in question do not "change a wetland's hydrological regime." *Akers*, 785 F.2d at 822. *Akers* involved a farmer who proposed draining some 2,900 acres of "Big Swamp," an area used to grow wetland crops, and converting it to "farm land suitable for growing upland crops." *Id.* at 816. The Court held that draining the wetland to create dry land, and thereby " 'significantly reduc[ing] the reach of Big Swamp,' " (*Id.*, quoting from the District Court's factual findings), warranted imposition of the recapture provision's exception to the farmer exemption. Recognizing, however, that the recapture exception should not be allowed to

swallow the farmer exemption rule, the court specifically admonished:

> At oral argument, counsel for the government advocated a position of complete authority to prohibit all changes in wetland use which involve discharges of pollutants without prior [ACE] approval. Discing of soil is a point source of pollutants, according to [ACE].
>
> Responding to our inquiries, government counsel asserted that [ACE] would require Akers, and other farmers like him, to obtain a § 404 permit before switching from one type of wetland crop to another, if the new crop had not been farmed previously. For example, if Akers desired to plant wild rice, a wetland crop, the [ACE] would require a permit since rice has not been farmed in Big Swamp in the past.
>
> Although we affirm the injunction as a reasonable response to the peculiar facts before us, *we do not endorse the government's authoritative position.* We do not believe that Congress intended to place the burden of [ACE] permit regulation on farmers who desire merely to change from one wetland crop to another.

*Akers,* 785 F.2d at 820 (emphasis added). Thus, the courts' decision in *Akers* gives substance to the farm exemption from CWA by holding that changes in agricultural activity enjoy exempt status from ACE permitting requirements provided that the activity does not impair, reduce or diminish the flow, circulation or reach of waters of the United States. This Court also notes with emphasis that the language of the recapture provisions does expressly apply to mere temporary reduction or impairment of the reach, circulation or flow of the waters prior to the completion of on-going projects.

■ Finally, in this case, EPA has attempted to show that Medore's dredging harmed the quality of the slough as habitat for flora and fauna. Nevertheless, neither the farm pond exemptions from the permitting requirements of CWA, nor the recapture provisions, express or imply a need to consider wildlife values when determining whether these subsections apply. In short, a wetland's function as habitat, either before or after farm pond construction, simply has no relevance as to whether work is exempted from CWA's permitting requirements.

### III.

■ Given the foregoing, the determinative issues at bar are (1) whether Debtors performed, had responsibility for, or controlled the acts which EPA alleges constitute violations of CWA, and (2) whether the dredging of Altenburg Slough qualifies for the 33 U.S.C. § 1344(f) farmer exemption provisions of CWA. As to the first issue, the deposit of dredge materials near the banks of the wetland, and the construction of the pond from the marshland constitutes the alleged violation. The Court has found, however, that Medore owned the ranch, while Debtors functioned as mere conduits of information conveying Medore's wishes to Miller, his contractor. Furthermore, Debtors had no financial responsibility for or supervisory control over where the spoils would abide or for how long. As the district court found in *Sargent County,* 876 F.Supp. at 1088, the important factors here are not what Debtors did so much as what they did not do. They did not, among other factors, (1) own the land, (2) order the work done, (3) pay for the work, (4) specify how, when or where the work would be done, (5) select who would do the work, or (6) provide plans for the work. Medore simply relied on them to relay his designs to the performing parties, be they engineers, contractors or machine operators. In short, Debtors wishes were irrelevant. Indeed, the one small variance from Medore's intentions that Neil did seek to accomplish (putting in a land bridge to one of the islands), Medore quickly and summarily rejected. On the other hand, without question, the work "could not have been accomplished without Medore's express approval." *Lambert,* 915 F.Supp. at 802–803. Thus, rather than Debtors, it was Medore who determined the disposition of the dredge spoil, and Miller whose machine and employee carried it out. As the Court made clear in its factual findings set forth heretofore, with regard to either the construction of the islands, or the temporary deposit of the spoils for draining and later removal, Debtors lacked the authority to take such decisions, or more important, to

countermand them once determined. Thus, Debtors cannot be said to have performed, bore responsibility for or controlled Medore's pond construction project, or any alleged CWA violations arising therefrom.

■ As to the farmer exemptions, Debtors have shown sufficient facts to establish that Medore's dredging of Altenberg Slough amounted to the "construction" of "farm or stock ponds." 33 U.S.C. § 1344(f)(1)(C); 33 C.F.R. § 323.4(a)(3) (1993). The evidence is uncontroverted that Medore wanted to expand the open area of the slough to allow his llamas to "reach the water." The application for permit alerted ACE to that fact. (Exhibit A). While the permit also included a secondary recreational use, in the Court's view, the incidental allowance of "canoing [sic] and swimming" on a tiny landlocked water body such as Altenberg Slough does not in any way conflict with the definition of a "farm pond" as contemplated in the farm exemption statute. EPA argues strenuously that Debtors adopted the position that Medore seeks the maintenance rather than construction exemption for the farm pond. The Court disagrees, and in fact finds the distinction irrelevant since the two activities appear in the statute in the disjunctive. Thus either will suffice. If Medore did not maintain a farm pond, he constructed one. If Medore did not construct a farm pond, he maintained one.

■ Moreover, Debtors have also elicited sufficient testimony and evidence to demonstrate that the recapture clause of 33 U.S.C. § 1344(f)(2) does not apply. As the Court has discussed, the first prong of the recapture provisions obtains if, but only if, the "the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced" by the dredging of Altenburg Slough. Roger Noble, who conducted a first-hand post-impact inspection of the site, testified that given the nature of the soils and the aquifer in the area, dredging would enhance the circulation, flow and volume of water flowing into the slough, as well as greatly increase its open water surface area. (June Tr. pp. 83–98). The Court regards this testimony—given by trained hydrologist employed by a neutral third party with responsibility for the health of the local waters, a person intimately familiar with the hydrology of both Altenburg Slough and the surrounding surface and sub-surface waters—as authoritative. Moreover, at the April hearing, in testimony to which no objection was taken, Laney Hanzel stated that upon consultation, the Montana Department of Natural Resources indicated to him that, at worst, the dredging had no impact on "flow or circulation of water in the slough." (April Tr. p. 64.) Thus the dredging activity clearly did not impair the flow or circulation of Altenburg Slough.

■ Henke, EPA's expert, disagrees. Henke, however, admitted that he and made no measurements with which to evaluate these positions until returning to the area in preparation for the June hearing, at which time EPA would have informed him of what he needed to find. Moreover, his findings, to the extent they have any credibility, do not suffice to invoke the recapture provisions. First, Henke claims that the spoil deposits dam rainwater and snow meltwater, diverting in a very minor way—and not preventing—run-off into the slough. Further, Henke speculated the damming effect may cause increased water levels in the adjacent wetlands, thereby impairing the flow and circulation of the water therein. (June Tr. p. 133.) To allow this strained finding to activate the recapture provisions, however, would render the farm pond exemption nugatory. In order to construct a reasonable farm pond, common sense dictates that some alteration to the historical flow and level of the local run-off must occur. Stated another way, construction of a farm pond implies the pond did not already exist. To cause one to exist will necessarily effect water flows. If such incidental and unavoidable alteration invokes the recapture provisions, then the farm pond exemption constitutes a mere superfluity. Courts must avoid if possible the interpretation of a statute which abnegates the meaning or effect of portions of its language. *E.g., United States v. Nordic Village, Inc.,* 503 U.S. 30, 35, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992). Thus, the Court must interpret the minor run-off diversions, which are incidental and ultimately necessary to farm pond construction, as other than a le-

gally significant impairment of the circulation or flow of the waters of Altenburg Slough.

Henke also claimed the spoils converted some 2.5 acres of wetlands to uplands, as well as changed the nature of other of the wetlands. Henke based the former statement on his testimony that spoils were placed atop wetlands on the banks of the pond. As the Court stated heretofore, however, this testimony contradicts EPA's witness, David Brewer, the excavator operator who placed the spoils—and who appeared on EPA's behalf without subpoena. In addition, while the overlap may have occurred to a minimal extent in this small impact area, its effects can hardly be reasonably characterized as a "conversion of wetlands to drylands" in either the fundamental nature or sheer magnitude that has occurred in cases such as the Ninth Circuit encountered in *Akers*. Again, in the case at bar, any minor conversions of tiny areas of wetlands to marginal drylands unequivocally did not alter the hydrological regime of the slough, and cannot therefore be considered legally significant.

Finally, Henke opined that wave action on the increased surface waters of the slough have a detrimental effect on circulation of the slough, including increases in the effects of erosion. Once again, however, the construction of a pond necessarily implies increased water surface area. To say that the increased waves also necessarily caused by this increase triggers the recapture provisions denudes the farm pond exemption of any meaning. In addition, this end of the slough had open water prior to the dredging, with concomitant wind driven waves. To say that the added wave action has significantly "increased erosion" on a six acre enclosed basin slough with even less actual surface area, with no water-flow and with heavily vegetated banks flatly defies common sense. Finally, the islands EPA complains of would tend to defeat the effects of wave action by presenting an obstacle upon which wave energy would dissipate. As before, Henke's credibility, and the weight of his testimony falls entirely short of convincing.

As for the reach of the slough, by all accounts, the dredging greatly enhanced the volume of water there. In addition, no dispute arises over the presence of an increased area of open water. EPA, however, argues that some of the spoil deposits "obliterated" emergent wetlands, and thus decreased the reach of the waters of the United States. The Court disagrees. The Tenth Circuit Court of Appeals held that under 33 U.S.C. § 1344(f)(2), a reduction in "water quantity" impaired water circulation and flow and reduced the reach of the waters. *Riverside Irr. Dist. v. Andrews*, 758 F.2d 508, 512 (10th Cir.1985). The inverse of this logic is that where a project enhances water quantity, the reach of the waters is increased. Moreover, after buying the land, Neil attempted to remove the spoil piles from near the banks of the pond in June of 1994, but both ACE and EPA took vehement action to prevent him from completing the effort. Had the government agencies not done so, the conditions on the banks of the pond would not obtain today. In such case, only the islands would comprise the alleged violation remaining as of the July, 1994. Thus, for the purposes of Debtors' liability, only the islands have any relevance for application of the recapture provisions.

Yet, as the Court already explained, Debtors had nothing to do with the decision to create the islands, nor did they do the actual digging, and therefore did not perform or control such activity sufficient to satisfy the elements of CWA. Even if they did, however, the islands have had no effect on the flow or circulation of the slough. Likewise, these small bits of dry land, barely raised above water level, can have decreased the total wetlands within the borders of Altenburg Slough only by some de minimis amount. The large increase in open waters and particularly water volume and quantity, has more than off-set the islands' marginal diminishment of the total wetland area. Thus, the dredging did not impair the flow or circulation of the waters of the slough, or reduce the reach of the waters. Consequently, the first prong of the recapture provisions does not apply, and their application is precluded.

▪ Even assuming such were not the case, however, the second prong of the recapture provisions also does not apply. Construction of a farm pond in Altenburg Slough

does not constitute a new use. To reiterate a point addressed heretofore, construction of a farm pond implies that one did not already exist. Consequently, as applied to such construction the "new use" provision of § 1344(f)(2) cannot mean, as EPA suggests, that if a farm pond did not in the past exist, then the construction of such constitute a new use sufficient to invoke the recapture provision. Again, such an interpretation would impermissibly render the pond construction exemption a mere superfluity. *Nordic Village, Inc.*, 503 U.S. at 35, 112 S.Ct. at 1015. Rather than nullify the construction language, the Court holds that, as the Eleventh Circuit Court of Appeals has instructed, "the plain purpose of the statute and regulations is to allow people to build ponds in connection with a previously established farming operation." *Conant v. United States*, 786 F.2d 1008, 1010 (11th Cir.1986). In *Conant*, the violation involved construction of a fish pond on a new fish farming operation on property where this fish farming had never before occurred. *Id.* Consequently, the court held the pond did not qualify for the § 1344(f)(1)(C) farm pond exemption because the fish farm entailed a "new use." *Id.*

In the case at bar, the last three operators of the ranch have engaged in hoofed animal husbandry—first horses, then llamas. These animals have had access to and have occasionally used Altenburg Slough for watering. Medore decided to try to expand this use and to allow for other farm uses of the slough by constructing there a farm or stock pond. Because the Altenburg Slough had functioned as a watering hole in the past, and because the pond would have enhanced Medore's ongoing farming operation, construction of the pond does not entail a new use sufficient to trigger application of the recapture provisions.

Finally the Court adds the comment that the cases reported interpreting the provisions of 33 U.S.C. § 1344(f)(2) to recapture § 1344(f)(1) exempt activities have involved farming operations of relatively massive scale, in most instances effecting and/or draining thousands of acres of wetlands. *See, e.g., Huebner*, 752 F.2d at 1237 (violator's activities altered 5,000 acre portion of

largest continuous wetlands in Wisconsin); *Akers*, 785 F.2d at 816 (violators sought to convert some 2,900 acres of wetlands to uplands); *Avoyelles Sportsmen's League, Inc.*, 715 F.2d at 901 (violators intended to clear 80,000 forested tract of wetlands); *Cumberland Farms*, 647 F.Supp. at 1172 (violators had almost 1,400 acres of land drained for cultivation and planned to drain five hundred more); *Brace*, 41 F.3d at 129 (violators drained 30 acre wetland using four miles of plastic tubing). Moreover, notwithstanding the relative scope and magnitude of the activities in these cases, their adjudication have been relatively close calls, requiring lengthy litigation and substantial analysis by the courts to resolve. In sharp contrast, the instant case involves a infinitesimal conversion of wetlands on minor farm operation effecting—by EPA's own account—two and one-half acres of enclosed basin marsh, with no connection whatsoever to any neighboring waters. (*See, e.g.,* June Tr. p. 145.) The insignificant size and impact of Medore's dredging activities likely explains ACE's disregard for the details of the permit application. When compared with the magnitude of the violations in the reported cases, the Court regards the analogy EPA tries to draw between the case at bar and the precedents cited in its argument as tenuous at best, and ultimately of little value to EPA for prevailing on the issues in this case. *But cf. Brace,* 41 F.3d at 127.

Finally, the record clearly indicates that but for the actions of EPA and ACE in this case, Debtors would have removed the allegedly transgressing spoils from the banks of the pond by July, 1994. In addition, based on their attempts to comply with the contradictory orders of the agencies, Debtors would quickly have lowered the islands complained of if EPA and ACE had cooperated to order them to do so. They not only volunteered to do as much, but had actually began removal work when brusquely ordered to stop. Instead, EPA chose to make a federal case of this matter. In the Court's view, the maxim *de minimis non curat lex* obtains here. It has been said that to "protect our overburdened federal [trial] judges from being flooded with minor claims better handled by [other] machinery ... than by

the national judiciary," parties in minor disputes should first resort to voluntary cooperation before rushing to litigation. *Swick v. City of Chicago,* 11 F.3d 85, 87 (7th Cir. 1993). The Court finds such advice apropos to the government's actions in this dispute.

## CONCLUSION

The foregoing analysis compels a conclusion that Debtors did not perform the construction of Medore's pond on Altenberg Slough. Moreover, the evidence is insufficient to conclude that they had control over or responsibility for the project, either in a supervisory or a financial capacity. Consequently, the first elements of § 404 has not been satisfied with regard to Debtors, and therefore, Debtors cannot be held liable for any CWA violation that may have occurred in the construction of the pond. In addition, under the farm pond exemptions at 11 U.S.C. § 1344(f)(1)(C), Medore's dredging, accomplished in conjunction with his farming operation, did not require an ACE permit. To use Senator Muskie's words, the instant discharges did not "convert extensive areas of water into dry land or impede circulation or reduce the reach or size of the water body." 3 *Legislative History of the Clean Water Act of 1977* ('Leg.Hist.'), supra, at 474. Thus the work avoids the recapture provisions of 11 U.S.C. § 1344(f)(2). Likewise, while it is likely the discharge resulted "in significant discernible alterations to flow or circulation," these changes enhanced rather than impaired such flow, and consequently, 33 C.F.R. § 323.4(c) provides that no permit was required. Thus, the conclusions reached by ACE in its NPR letter (if not the qualifications therein) were absolutely correct— Medore's proposed activities reflected in the application for permit, and engaged in during the winter of 1993–1994, did not require ACE approval. Simply put, the un-permitted construction of Medore's pond did not constitute a violation of the Clean Water Act. Thus, EPA has failed in its ultimate burden of showing, upon Debtor's objection, that its claim is enforceable "against the debtor and property of the debtor under ... applicable law." 11 U.S.C. § 502(b); Rule 3001(f), F.R.B.P.; *Wright v. Holm (In re Holm),* 931 F.2d 620 (9th Cir.1991). Accordingly,

IT IS ORDERED the Objection to United States Proof of Claim, filed by Debtors on February 26, 1997, is sustained, and the claim is disallowed.